TOALI'I ASUEGA of Pago Pago, TAVAI of Pago Pago, LEI of Nu'uuli, IULIO M. TAUFAASAU of Pago Pago, TE'O of Pago Pago, LAGO of Pago Pago, SIALEGA P. MAUGA of Pago Pago, UTAIFEAU T. of Pago Pago, S. P. AUMOEUALOGO of Aua, MAGEO FELISE of Pago Pago, FOLAUSAUA of Fatamafuti, R. S. TAGO of Pago Pago, SAMI MAUGA of Pago Pago, and LEULUA'I of Pago Pago, Objectors

v.

R. S. MANUMA of Pago Pago, Applicant

No. 123-1963

High Court of American Samoa

Civil Jurisdiction, Trial Division

[Matai Name: "Mauga" of Pago Pago]

March 1, 1965

Fofo, Counsel for Lei.
Mageo, Counsel for Iulio M. Taufaasau.
Ta'a, Counsel for Te'o.
Lolo, Counsel for Sialega P. Mauga.
Apelu, Counsel for S. P. Aumoeualogo.
Folausaua, Counsel *pro se*.
Muasau, Counsel for Sami Mauga.
Usu, Counsel for Leulua'i.
Tuia, Counsel for R. S. Manuma.

Objectors Utaifeau T. and Mageo Felise withdrew their objections on the day of the pre-trial conference on January 25, 1965.

Objectors Lago, Tavai, and R. S. Tago withdrew their objections immediately before the commencement of the trial on February 1, 1965.

Objector Toali'i Asuega, personally and by and through his counsel, Mrs. Tamasese, withdrew his objections at 2:00 P.M. of the first day of the trial on February 1, 1965.

OPINION OF THE COURT

ROEL, *Associate Justice.*

On August 20, 1963, R. S. Manuma, hereinafter referred to as Ropati, filed his application with the Registrar of Titles to be registered as the holder of the matai title Mauga, attached to the Village of Pago Pago. Each of the objectors listed above filed his objection to said registration by Ropati within the statutory period for submitting such objection and each of them became a candidate for the title Mauga, together with Ropati, hence this litigation. (See Section 6.0106, Code of American Samoa, 1961 Edition.)

Previous to the trial of the case, a pre-trial conference was held on January 25, 1965, at which all the candidates and their counsel were present. The record will reflect that the following stipulations were agreed to amongst the parties, to which stipulations each party agreed to be bound at the trial of the case:

1. That there was no objection to any of the judges sitting.

2. That the title Mauga became vacant on February 7, 1963, through the death of the then title holder, Mauga Palepoi Afamasaga.

3. That since the title became vacant there had been only one general meeting of the Mauga Family, said meeting having been held on August 12, 1964.

4. That at the only meeting of the Mauga Family on August 12, 1964, there was no one selected to hold the title Mauga.

5. Regarding the pedigree or hereditary right of the candidates, the following stipulations were agreed upon:

 a. That the Applicant Manuma has $\frac{1}{4}$ Mauga blood.

 b. That Toali'i Asuega has $\frac{1}{16}$ Mauga blood.

 c. That Lei has $\frac{1}{4}$ Mauga blood.

 d. That Iulio M. Taufaasau has $\frac{1}{4}$ Mauga blood.

 e. That Sialega P. Mauga has $\frac{1}{2}$ Mauga blood.

 f. That R. S. Tago has $\frac{1}{16}$ Mauga blood.

 g. That Sami Mauga has $\frac{1}{16}$ Mauga blood.

 h. That Leulua'i has $\frac{1}{16}$ Mauga blood.

NOTE: No stipulation regarding hereditary right was reached on the following:

 i. Te'o, who claimed $\frac{1}{4}$ Mauga blood.

 j. S. P. Aumoeualogo, who claimed $\frac{1}{256}$ Mauga blood.

 k. Folausaua, who claimed $\frac{1}{256}$ Mauga blood.

6. That there be only one argument for each candidate, provided that the Applicant, Ropati, waived his right to an opening argument and would argue and rebut after the conclusion of argument by all the objectors.

7. That each candidate would be allowed not more than one (1) hour for his argument, the one hour to include the time necessary for interpreting.

8. That each candidate would be entitled to one witness only at the trial, the witness to be the candidate himself.

Section 6.0101 of the Code sets out the basic qualifications which a person must have to be eligible to succeed to a matai title. The three subsections relevant herein read as follows:

"1. He must have at least one-half Samoan blood.

"2. He must live with Samoans as a Samoan.

"3. He must be a descendant of a Samoan family and chosen by his family for the title."

Section 6.0104 of the Code reads as follows:

"CLAIM OF SUCCESSION TO TITLE: *Every* person claiming succession to a matai title shall file with the Clerk of the High Court a written claim of succession to the title. Such claim shall be accompanied by a certificate from the chiefs of the village in which the claimant lives to the effect that such matai name is an old matai

title of the Samoan people and a petition signed by three-fourths of the members of the claimant's family over 20 years of age asking that the claimant be registered for the matai title." (Emphasis added.)

At the beginning of the trial Usu, Counsel for Objector Leulua'i, made a motion to the Court to dismiss the applicant's petition and the case as a whole on two grounds, mainly that neither the applicant nor any of the objectors had been "chosen by his family for the title" as set out in subparagraph 3 of Section 6.0101 of the Code, since there was a stipulation agreed to by all the candidates that no one candidate had been chosen for the title at the only meeting of the Mauga family on August 12, 1964, and on the further ground that the applicant's petition was not signed by three-fourths of the family members of the Mauga Family as required under Section 6.0104 of the Code.

Counsel Usu was joined in his motion by counsel for some candidates, and the motion was opposed by counsel for other candidates on the grounds that the application as presented by Ropati had been accepted by the Clerk of the High Court and that it would serve no purpose to dismiss the case since the Mauga Family had had almost two years to settle the matter and had been unable to do so, and a dismissal would only serve to delay an inevitable trial after the family failed to agree on any one person. The Court did not rule on the motion one way or the other but kept it under advisement throughout the trial. We will now consider said motion.

Usu's motion, if granted, would have had the effect of denying or dismissing the application of Ropati. If this were done, all the objections by the other candidates would also have to be dismissed since once the application is dismissed there would be nothing to object to. The natural sequence to this would be to throw the ball back at the Mauga Family to agree on one candidate. The Mauga Family had two years to pick a candidate favorable to all and failed

miserably in this task. There is no reason to believe that the Mauga Family could agree on any one person if they had five more years to contemplate the issue.

Paragraph 3 of Section 6.0101 reads: "He must be a descendant of a Samoan family and chosen by his family for the title." As is the case with other parts of Title VI—MATAI TITLE PROVISIONS—this section of the Code leaves much to be desired in the way of clarification. This section does not specify whether the word "family" refers to the immediate "family" of the candidate or to the "family" as composed by all the people in all the clans included in the matai title. If it includes more than just the immediate family of the candidate, it does not specify whether the candidate must be chosen by 100% of the members of the whole matai title family, or by the majority or any given percentage. It is obvious that if the candidate were chosen by 100% of all the members of all the clans in the matai title family, then there would be no case in Court since he would have been chosen without any opposition from anyone, and there would be no objectors to the application to register the title. We think this provision needs clarification. While we would not hesitate to give our own interpretation if it were absolutely necessary, we believe this is a task within the sphere of the Legislature.

■ As quoted before, Section 6.0104 makes *Every* candidate for a matai title subject to its provisions. In other words the provision that "such claim shall be accompanied by a certificate from the chiefs of the village in which the claimant lives to the effect that such matai name is an old matai title of the Samoan people and a petition signed by three-fourths of the members of the claimant's family over 20 years of age asking that the claimant be registered for the matai title," appears to apply not only to the original applicant for the title but to each of the objectors as well since, once a person objects to the application to register a

matai title he himself becomes a claimant. As is the case with Section 6.0101 and other sections under Title VI, Section 6.0104 leaves much to be desired in the way of clarification or legislative intent.

How is it possible that one original applicant and 15 objectors in a matai title case can each get "three-fourths of the members of the claimant's family over 20 years of age asking that the claimant be registered for the matai title"? Does the word "family" refer to the immediate family of the candidate or to every person in every clan or family of the candidate or to every person in every clan or family under the matai title? If it refers to every person in the whole family of the matai title, it is obvious that not even two, much less 16, candidates can get three-fourths of the members of said family to sign his application, unless the great majority of signatures are of the same persons. In the instant case we have candidates from Pago Pago, Fatama-futi, Nu'uuli, and Tula. Does the statute mean that the chiefs of Tula are to certify that the title Mauga is an old matai title in Pago Pago when it says, "such claim shall be accompanied by a certificate of the chiefs of the village in which the claimant lives to the effect that such matai name is an old matai title of the Samoan people" or does it refer to the chiefs of the village to which the title is attached? Here again we believe that this section is crying out for clarification, and that the Legislature should say what it means without delay.

■ After considering the motion to dismiss by counsel for Leulua'i and after considering the pertinent sections in the Code in their present confused state, it is the unanimous opinion of this Court that the motion to dismiss should be and the same is hereby denied. We believe that the intention of the Legislature is not and should not be to frustrate or make impossible the selection of a matai when a title becomes vacant, since it is obvious that a family should have

a head or a matai when no such head exists because of the death of the previous holder. Here the Mauga family members had nearly two years to select a head after the last Mauga died. To send the matter back to the family would not guarantee the selection of a matai, but would only contribute further to the disagreements and disintegration of that family unit. It was obvious from the testimony at the trial that even at the clan level the members of one clan could not agree on any one from their own clan to support for the candidacy. The Court is of the opinion that considering the widespread clash and conflict within the clans and between the different clans of the Mauga title, it would be almost an impossibility for any one candidate to obtain the backing and the signatures of three-fourths of all persons over 20 years of age in the Mauga Family. The figures on the total number of persons in the Mauga Family as expressed at the pre-trial conference by the different candidates ranged from 300 to 5,000.

This Court is of the opinion that it has jurisdiction in this matter and that each of the candidates at the trial was eligible under the basic qualifications as set out in Section 6.0101 of the Code of American Samoa. Counsel Usu's motion to dismiss is hereby denied. To do otherwise would only lead to chaotic and confusing conditions in the selection of a matai by judicial determination.

Section 6.0107 of the Code sets out the considerations which shall guide the Court in determining which of the candidates shall be registered as the holder of a matai title. It reads as follows:

"CONSIDERATION GIVEN BY COURT: In the trial of matai title cases, the High Court shall be guided by the following considerations, in the priority listed:

"First: The best hereditary right in which the male and female descendants shall be equal in families where this has been customary, otherwise the male clan shall prevail over the female.

623

"Second: The wish of the majority or plurality of those clans of the family as customary in that family.

"Third: The forcefulness, character, personality, and knowledge of Samoan customs.

"Fourth: The value of the holder of the matai title to the family, the village, and the country."

Based on the stipulation as before set out, the Court finds that the hereditary right of the different candidates is as follows:

R. S. Manuma—$1/4$ Mauga blood;

Lei—$1/4$ Mauga blood;

Iulio M. Taufaasau—$1/4$ Mauga blood;

Sialega P. Mauga—$1/2$ Mauga blood;

Sami Mauga—$1/16$ Mauga blood;

Leulua'i—$1/16$ Mauga blood.

In connection with the candidates as to whom there was no stipulation as to their hereditary rights, the Court, after considering the testimony and the evidence, finds that candidate Te'o has $1/16$ Mauga blood; that candidate S. P. Aumoeualogo has no Mauga blood whatsoever; and that candidate Folausaua has $1/4096$ Mauga blood if, as we believe, he traces his nearest Mauga blood connection to twelve generations back.

Accordingly, this Court is of the opinion that candidate Sialega P. Mauga, with $1/2$ Mauga blood, prevails over all the candidates on the issue of best hereditary right. This Court is further of the opinion that candidates R. S. Manuma, Lei, and Iulio M. Taufaasau each have $1/4$ Mauga blood and each ranks second on the issue of hereditary right. The Court further finds that candidates Sami Mauga, Leulua'i, and Te'o each have $1/16$ Mauga blood and that each ranks third on the issue of hereditary right. Candidate Folausaua with $1/4096$ Mauga blood ranks fourth on this issue.

We now pass on to the second issue under Section 6.0107, "The wish of the majority or plurality of those clans of the family as customary in that family."

Each of the candidates testified that there were only three (3) clans in the Mauga Family. Considering that the Legislature has not as yet furnished a clear or any definition of the word "clan," the agreement from testimony at the trial that there were three clans in the Mauga Family was a pleasant surprise, since no such agreement was possible at the pre-trial or in pedigrees in writing submitted by the different candidates. The great majority of the candidates testified at the trial that the three clans of the Mauga Family were the Sai, Pulumataala, and the Manuma clans. Applicant Ropati disagreed with the grat [sic] majority and testified that the three clans were the Viavia, Manuma, and the Sai clans.

Applicant Ropati testified that he had the support of two clans in the Mauga family, the Viavia clan and the Manuma clan. It was obvious from the evidence that the Viavia clan and the Manuma clan are one and the same, and that Ropati either did not know or did not agree with the tradition of the Mauga Family or he purposely set them out as two distinct clans. Of all the nine candidates that remained to the conclusion of the case, Ropati was the only candidate that did not mention the Pulumataala clan as one of the clans in the Mauga Family, and he testified that he did not know that Mauga Pulumataala was the Mauga that first brought dignity to the Mauga title. It was also clear from the testimony that Ropati did not have the undivided support of even the Manuma clan when it was alleged, without objection, that at least one person from the Manuma clan, Mageo, was backing a candidate other than Ropati.

Candidate Lei testified that he was supported by the Feaumalosi clan or the Sai clan. However, since two other candidates, Palepoi Mauga and Sami Mauga, were admit-

tedly also members of the Sai clan, it was obvious that Lei did not have the full support of the clan Sai.

Candidate Iulio testified that he was supported by all the three clans in the Mauga Family, the Sai clan, the Manuma clan, and the Pulumataala clan. Since there were two other candidates admittedly from the Pulumataala clan from whom Iuliu [sic] descends, mainly Te'o and Leulua'i, and three candidates from the Sai clan, and Ropati was a candidate from the Manuma clan, it was obvious that Iulio did not have the undivided support of the three clans. He might have meant to convey the idea that he had supporters from each of the three clans, since the testimony reflected that Mageo from the Manuma clan was backing him and that R. S. Tago from the Sai clan was also individually backing him. But a small part of a clan is certainly not a whole clan.

Candidate Te'o testified that he was supported by no clan.

Candidate Sialega testified that he had the support of the Fue clan and support from some of the Pulumataala clan. The Fue clan is the same as the Sai clan. Since there were two other candidates admittedly from the Sai clan, Lei and Sami, it was obvious that Sialega did not have the full support of the Sai clan. Certainly he did not have the full support of the Pulumataala clan since Iulio, Te'o and Leulua'i were candidates from the Pulumataala clan.

Candidate Logo testified that he was supported by one of the three clans in the Mauga family, the Tulimalefoi clan. This Court is of the opinion, and we so hold, that there is no such clan as the Tulimalefoi clan in the Mauga Family, and that, accordingly, Logo is not supported by any clan or by any fraction or portion of any of the three clans in the Mauga Family. As we have stated before, this Court finds that candidate S. P. Aumoeualogo has no Mauga blood whatsoever.

Candidate Folausaua testified that he was supported by Mulivai clan, one of the three clans in the Mauga Family. The Mulivai clan is supposedly one and the same as the Sai clan. Since there were three other candidates who were admittedly members of the Sai clan, it is obvious that Folausaua did not have the full support of the Sai or Mulivai clan. As a matter of fact, this Court is of the opinion, and we so hold, that candidate Folausaua did not have the support of any portion of the Sai clan.

Candidate Sami Mauga testified that two clans supported her candidacy, the Fue-Faanoa and the Pulumataala clans. The Fue-Faanoa clan is the same as the Sai clan. Since there were two other candidates from the Sai clan, of which Sami is a member, it is obvious that Sami did not have the full support of the Sai clan. Since there were three members of the Pulumataala clan as candidates, including Sami's husband Leulua'i, it is obvious that Sami did not have quite the full support of the Pulumataala clan. If she claimed any individuals of that clan as her supporters, she did not mention them.

Candidate Leulua'i testified there were three clans in the Mauga Family and that he had the support of two clans, the Fue-Faanoa clan and the Pulumataala clan. These two clans are the same two clans who Sami, Leulua'i's wife, claimed were supporting her. Since there were two other members of the Pulumataala clan as candidates, Iuliu and Te'o, it is obvious that Leulua'i did not have the full support of the Pulumataala clan from which he claims to descend. Since there were three candidates from the Fue-Faanoa or Sai clan as candidates, including Leulua'i's wife Sami, it is obvious that Leulua'i did not have the full support of the Fue-Faanoa clan.

■■ After considering the testimony and the evidence, the Court unanimously finds that there are three (3) clans in the Mauga Family, to wit: (1) Feaumalosi clan also

627

known as the Sai clan, Lei clan, and Fue-Faanoa clan, (2) the Pulumataala clan, and (3) the Manuma clan. The Court further finds that none of the candidates before the Court had the support of the majority or plurality of those clans of the family as customary in the Mauga Family. Since we find that none of the candidates had the support of the majority or plurality of the clans in the Mauga Family, the Court will disregard this issue in arriving at our selection of the next holder of the Mauga title. The statute does not say "the wish of the majority of the members of each clan" or "the plurality of each individual clan." As we read the statute, in a case where there are three clans in the family, a candidate must show that he has the full support of at least two of those three clans to prevail on this issue against the other candidates. Here again, we feel that if the legislative intent is not clearly set out as the statute appears in the Code, it is the responsibility of the Legislature and not the Court to clarify the issue. If and when it becomes necessary, this Court will furnish its own definition if the Legislature fails to act on the matter.

 We now come to the consideration of the third and fourth issues under Section 6.0107 of the Code, to wit: "The forcefulness, character, personality, and knowledge of Samoan customs" and "The value of the holder of the matai title to the family, the village, and the country." It is certainly not the easiest of tasks for anybody to make a selection regarding the above qualities when there are nine candidates involved and ten days of evidence and testimony to consider. This Court spent many, many hours weighing the individual qualities of each of the nine candidates under the third and fourth issues under Section 6.0107. We have considered the evidence, the testimony, the arguments, and the exhibits; we have taken into specific account the forcefulness, the character, personality, knowledge of Samoan customs, the value to the family, village and country,

the personal demeanor, presence of mind, the clarity, speed and correctness with which answers were given, candidness, the ability to stand up to thorough and rigorous cross-examination, the education, the self-confidence, and other qualities which are reflected from the speech and behavior of the candidates, matters which can be assessed only from the personal observation of each individual candidate in arriving at our decision under the third and fourth issues under Section 6.0107.

We have considered going into the direct testimony and answers to questions on cross-examination of each of the nine candidates in this opinion, but we feel that such a detailed opinion would not be in the best interest since it would take a great many pages to set all this out. The Court's personal notes alone amounted to 260 pages. At any rate the whole proceedings are fully reflected in the record. What we will do is to set out in some detail the testimony and answers to questions on cross-examination by the candidates which this Court ranks in the first and second place under the third and fourth issues of Section 6.0107.

On the third issue, "The forcefulness, character, personality and knowledge of Samoan customs," the Court ranks the candidates as follows:

First—Iulio M. Taufaasau

Second—R. S. Manuma

Third—S. P. Aumoeualogo (While this candidate displayed adequate forcefulness and knowledge of Samoan customs, this Court feels that it was in bad taste for him to apply as a candidate for the Mauga title when he should have known that he had no Mauga blood whatsoever. In the eyes of the Court, his action greatly diminished his character and personality.)

Fourth—Sami Mauga

Fifth—Leulua'i

Sixth—Sialega P. Mauga and Lei

Seventh—Te'o

Eighth—Folausaua

Accordingly, after considering all the factors above set out, the Court finds that candidate Iulio M. Taufaasau prevails over each of the other candidates on the issue of forcefulness, character, personality, and knowledge of Samoan customs. The Court further finds that the other eight candidates rank in the order set out above on this same issue.

On the fourth issue, "The value of the holder of the matai title to the family, the village, and the country," the Court ranks the candidates as follows:

First—Iulio M. Taufaasau

Second—R. S. Manuma

Third—Sami Mauga

Fourth—Leulua'i

Fifth—Lei

Sixth—Sialega P. Mauga

Seventh—Te'o

Eighth—Folausaua

Ninth—S. P. Aumoeualogo (Here, while this candidate may possess some outstanding personal qualifications, this Court feels that the imposition by a non-member of a family as matai of that family would only serve to create dissatisfaction, chaos and general resentment in the whole family, that such a candidate rather than be of any value to the family would be a great detriment. It follows that as a matai of such family such a person would be of no value either to the village or to the country.)

We will now go into the matter of setting out the testimony on direct examination and cross-examination of candidates Iulio M. Taufaasau and R. S. Manuma whom we have rated first and second, respectively, on the third and

fourth issues of Section 6.0107 of the Code, and other points concerning each of the two candidates.

Ropati Manuma testified that he was 56 years of age and lived at Pago Pago. He testified he had lived at Pago Pago all his life, but later testimony showed that he was away for long periods. He testified at first he had 100% Samoan blood, but later changed it to 87%; that he lived with Samoans as a Samoan, and that he was a descendant of a Samoan family.

Ropati's application to be registered as the holder of the title Mauga as submitted to the Clerk of the High Court on August 20, 1963, was introduced into evidence as applicant's Exhibit No. 1. When asked why page 2 of the application blank was not filled out but left blank, Ropati did not give a responsive answer. Page two of said application blank is headed: "WE COMPOSING (3/4ths) OF THE MEMBERS OF 'MAUGA' FAMILY OVER 20 YEARS OF AGE APPROVE THE PETITION OF Manuma, R. S. EACH PERSON APPROVING THIS PETITION MUST SIGN PERSONALLY. NO ONE ELSE CAN SIGN FOR YOU." Immediately underneath is the translation into the Samoan language.

When asked if the 18 names on the third page of the application represented all the members of the Mauga Family, Ropati testified that there were another six people who had given him their support via mail from the United States. He further stated that the signatures on page 3 should have been on page 2 of the application. When asked if the 18 names made up three-fourths of the people over 20 in the Mauga Family he answered that they made up three-fourths of his own immediate Manuma Family. When asked if the 18 were all members of his family, he answered that only 18 had approved his petition. In answer to another question, Ropati stated that there were about 600 members in the Mauga Family, but that he did not know how many of

them were over 20 years old. He later stated that there were about 30 members over 20 years old in his immediate family, and that altogether there were about 200 people in his immediate family.

In answer to his counsel's questions, Ropati stated he had only 87½% Samoan blood and not 100%. He also changed or modified the answers he had previously given the Court regarding the time he had been away from American Samoa. He had first stated he had been away from American Samoa only twice; now he testified he had been out of American Samoa eight or nine times for different periods of duration.

When asked by his counsel, Tuia, if he had approached any members of the Mauga Family outside of his clan before he filed his application, Ropati answered that he had approached Sialega and Iulio six times and that neither of them told him he would object, and that he thought they both agreed to his filing. Ropati later stated he had approached Te'o, too, but that Te'o had given him no answer. Ropati also claimed to have approached Leulua'i. Ropati answered that he had not contacted the rest of the objectors because they descended from the same clans as the people he had approached. When his counsel asked him if any member of the Manuma Family objected to him, Ropati answered in the negative.

When asked by Fofo, counsel for Lei, if the agreement of Sialega and Iulio represented the wish of the Mauga Family, Ropati answered that it was his belief that they were involved in the other Mauga trial; that he had not consulted Lei because Sialega and Lei were the same thing, that they would take the same side. Again in answer to Fofo's question, Ropati stated he was also related to Mauga Viavia, Mauga Titilupe and Mauga Mulivai.

Under questioning by Mageo, counsel for Iulio, Ropati testified he had not included a trip to Tonga in his previous

testimony; that he had forgotten. He also stated that he had 12½% Tongan blood.

Under questioning from Ta'a, counsel for Te'o, Ropati answered in the affirmative when asked if he had complied with Sections 6.0101 and 6.0104 of the Code. Ropati answered that out of about 200 members in his immediate family, 24 had agreed for him to register for the title.

In answer to questions by Lolo, counsel for Sialega, Ropati testified that he had registered for the title before the only meeting of the Mauga Family; that his application was in accordance with the fa'a Samoa regarding matai titles; that it would not have been possible to settle the title problem within the family if he had consulted all the members of the family before filing the application for the title; that he, Ropati, had tried for three months and that no family settlement was possible.

Ropati testified that Te'o did not have one-fourth Mauga blood as he claimed; that as far as he, Ropati, was concerned, Te'o had no Mauga blood. He also testified that Aumoeualogo and Folausaua had no Mauga blood at all.

Ropati testified that there were three clans in the Mauga Family: the Viavia clan, the Manuma clan, and the Sai or Tei clan, and that of these three the Viavia and the Manuma clans favored his candidacy.

In connection with the third issue regarding forcefulness, character, personality and knowledge of Samoan customs and the fourth issue regarding the value to the family, the village and the country under Section 6.0107 of the Code, Ropati testified that he was a true Samoan, lived as a Samoan and had rendered services; that he was known as the son of Mauga Palepoi; that he had served Mauga Palepoi under his, Ropati's, title of Utaifeau; that his services to Mauga set a good example for the rest of the family; that he presented Mauga with food daily, including Sundays; that he served and supported Mauga in everything Mauga

·asked; that at Mauga's Fiftieth Jubilee he, his family and others not related did everything for the celebration which was widely attended; that he gave fine mats, a keg of beef and other food on Mauga's birthday; that when Mauga wanted to enter a boat for the village on Flag Day, there was no money, and that his, Ropati's, own money had been used to buy everything for the boat, 70 feet long with 18 seats, called CENTIPEDE; that when Mauga didn't like the boat and wanted another one built two weeks before Flag Day, he offered to build it in one week; that he, Ropati, furnished most of the materials for this second boat and paid the carpenters; that the other families donated only one board and he donated all the rest; that he had to spend $300 for ordering oars from Hawaii after the boat was finished; that the boat was used to race in Western Samoa and that no boat has been built since; that if he got the Mauga title he would build three or four more boats.

Ropati testified that he was responsible, almost single-handed, for building Mauga's guest house at Gagamoe; that he had furnished his own materials for the guest house. He testified that when Mauga wanted a vacation he, Ropati, paid for his and Mauga's fare both ways to Hawaii and to the Mainland and also paid all the expenses; that when he, Ropati, built Darden Hall, he reserved a free seat for Mauga for life, even after he leased the building to Haleck. Ropati further testified that when Mauga Palepoi was taken sick to Honolulu, he, Ropati, went to stay at his bedside with him, and that he asked all the chiefs in Samoa to pray for Mauga's recovery; that when Mauga came back to the Hospital of American Samoa and was later released, Mauga went to Ropati's and his brother's house; that only he, his brother and Lei were with the sick Mauga; that he nursed Mauga personally until Mauga went back to Gagamoe in good health; that when Mauga died he, Ropati, arranged for his funeral and contributed 21 cases of mackerel, 3

634

fine mats, 60 loaves of bread, sugar, etc. Ropati further testified that he had objected in Court when Mauga tried to sell Fatumafuti, a communal land of the Mauga Family, and that in the end the land was only leased instead of sold.

Ropati testified that in Pago Pago the young men get drunk and fight; that when he was the leading young man in the village everything was well; that he used to gather the young men and plant a communal taro patch to get food for the village and that no one in Pago Pago had to buy taro at the market place; that he alone presented food for the village of Pago Pago, and that he used to supply taro and taamu even for people of other villages; that he had received a prize for being top-farmer.

Ropati testified that young people must develop talents and education; that he had tried to get a low-fare airline so that young people could leave Samoa to get an education and come back; that he mortgaged his theater to Haleck for $400 to go to Honolulu where he dealt with Transocean Air Lines, and that the fare from American Samoa to Honolulu had been cut from $340 to $149; that after awhile Transocean Air Lines discontinued service to American Samoa because of bankruptcy.

Ropati testified that he had helped the people of Manu'a by going to buy and getting the MANU'A TELE from Honolulu; that before bringing the boat down a lot of work had to be done on it and that he was in charge of the cleaning group; that he had to ask the Navy for a crew to bring the boat down to Samoa; that he did all this as a service to his people in Samoa.

Ropati testified that he was retired from the Armed Forces after 20 years of service; that in 1941 he had 30 men under him to man the three-inch guns here in Samoa; that he was also an instructor for the Fita Fita, as well as an instructor on radio and the Morse code; that after the war he worked on carriers transporting things to and from

the Pacific Islands; that he had fought for allotments for the dependents of servicemen and so that the members of the Fita Fita could wear pants; that he helped in securing dependency affidavits resulting in a lot of money to the people here in American Samoa. He also testified he had been awarded five medals and other certificates while in the Service; all these are included in applicant's Exhibit No. 5.

Ropati further testified that he had taken a course in surveying by correspondence when there were no surveyors in American Samoa; that the Department of Public Works let him train as a surveyor, though he started working as a "hard labor"; that he re-traced the airport to see if it was long enough for a jet runway; that he had checked on the site for the Marine Railway to see if it was suitable; that he reset some pins at the main dock for the building of the new dock, but left the job when it was only half done to get further education; that he was sent to Swains Island to set a bench mark; that he had surveyed and set the positions for the reservoir at Pago Pago to transfer water to the Fagatogo reservoir; that he was sent to Manu'a to check on a location for a wharf and that he recommended against the building of the wharf because the sea was too rough.

In connection with his formal education, Ropati testified that he had left Poyer School at the age of 18 to join the Fita Fita; that he had taken courses in fingerprinting, salesmanship, and a course at Blackstone School of Law; that he had not finished any of the courses; that he was presently studying surveying by correspondence; that he could strip a transit.

Ropati testified he helped the economy of Manu'a by advertising floor mats to the outside world and selling mats; that he had women at Aoloau and A'asu weave mats to sell; that before that no one was exporting mats.

In answer to questions by his counsel, Tuia, Ropati testified that Manuma was a matai title; that said title was

second to Mauga in importance. He testified that he was also holding the leading young man title of Utaifeau, which title had been given to him by Mauga Palepoi; that none of the other candidates ever held the Utaifeau title; that his sister Titilupe had held the title of Tulimalefoi as village virgin for Pago Pago.

On direct testimony Ropati further testified that he had served two Maugas, Moimoi and Palepoi; that his father had served the same two Maugas and had held the title Utaifeau; that neither Iulio nor Lei had served Mauga Palepoi; that Sialega was not recognized as a young man in Pago Pago because he did not live there; that recently Folausaua and Sialega had served when Palepoi died and that he had seen Iulio at Palepoi's funeral; that Sami and Leulua'i also served Mauga; that he, Ropati, had written down his services to Mauga Palepoi and had letters from Mauga recognizing said services. The list of services and letters was introduced into evidence as applicant's Exhibits No. 2 and 3. He testified that he, Ropati, had sponsored a professional boxer and had taken him to San Francisco; that after two wins and two losses, his fighter had retired and joined the army.

Ropati testified that when the Mauga Family members tried to remove the title from Mauga Palepoi, he, Ropati, sided with Mauga Palepoi against such move; that ultimately Palepoi was not removed as Mauga.

Still under questioning by his counsel, Tuia, Ropati testified that none of the other candidates contributed to the building of the guest house; that he and his family had contributed for the dedication of the guest house; that he was familiar with the Mauga lands, and named them as Gagamoe, Lemoli, Lesolo, Laloata, Levaga, and Fatumafuti; that he was familiar with the boundaries of said lands and knew who occupied what land; that the theater, Darden Hall, is on the land Gagamoe; that four Maugas from his

clan were buried at Gagamoe, namely, Viavia, Mulivai, Titilupe, and Manuma. Applicant's Exhibit No. 4 was introduced into evidence in connection with Ropati's dealings with Transocean Air Lines.

Ropati testified that he had never been arrested; that he did not use liquor, though later Te'o testified Ropati had slapped him when Ropati was drunk. Ropati testified that he had served in the Armed Forces and had some medals and letters in connection with his service, these being introduced into evidence as applicant's Exhibit No. 5; that he was getting retirement from his military service in in the amount of $134.56 per month and that he had Government insurance in the amount of $10,000 payable to his family upon his death; that he derived from $30 to $150 per month from products from his plantation and also gave produce free to members of his family; that every Friday he would serve Mauga with a basket of taros and bananas from his plantation all during the time he was recognized as Mauga's son from 1949 to 1957; that after March 1965, he would again get $55 per month rent from Haleck for the theater.

Ropati testified that when the title Manuma was presented to the Village of Pago Pago, none of the candidates had contributed; that when Sialega was presented with his title in Nu'uuli, he, Ropati, had contributed $10.

Ropati testified that if he were selected as Mauga he would bring the objectors and the family together; that he would be strong himself so that members of the family would look up to him and respect him; that he would support himself; that he would try to get the young men together and lead them to maintain fa'a Samoa customs and traditions; that he would encourage parents to educate the youngsters.

In connection with his value to the village, Ropati testified that he would lead the Village Council to clean

up the village, which now looks very bad, especially on the seaward side; that he would work with the chiefs in Pago Pago to use and cultivate the land for the benefit of the village; that he would have families survey their lands by metes and bounds to avoid future quarrels regarding the ownership of land; that the land should be registered; that he would try to set up a playground for the children of the village to give them something to do instead of using beer and fighting; that he would try to develop talent of youth as athletes.

Ropati testified that he would support the Government's program for education if given the Mauga title; that he would encourage villages to give land for school use; that he would try to see that Samoan customs and traditions be maintained under the matai system; that he would try and protect the Samoan land; that he would suggest to the Government to grant scholarships and have the students come back and help survey all of the Samoan lands; that he would set up a program to encourage agriculture to try and solve the shortage of food; that he had enough quality as a leader to lead the family, the village, the county, and the country.

On cross-examination Fofo, counsel for Lei, read one of the letters from Mauga Palepoi to Ropati, which Ropati had introduced into evidence, and read in part, "My son, Ropati, even though you have turned away from me many times, I still love you." When Fofo asked Ropati if, why, and when he had turned against Mauga, Ropati said he had refused to obey Mauga when asked to dance at some affair; that he had refused to dance like Mickey Mouse in front of everyone leading the parade. When Fofo asked him why he would object as the Utaifeau to perform such an honorable Samoan custom such as dancing, Ropati then stated he was sick at the hospital at the time. Ropati testified there were many other small instances when he disagreed with Mauga, such as the using of other titles in the family, as when Ro-

pati unsuccessfully objected in Court to the registration of the title Tamaalemalo; that he had heard from Sialega and Mauga there was a lease on Fatumafuti.

Ropati answered on cross-examination that he had mortgaged Darden Hall to the Halecks twice, the last time for $3,000. Ropati testified that as Utaifeau it was his duty to serve Mauga, whether he liked it or not. When asked when he last held a steady job, Ropati answered it was in 1955; when asked why he had abandoned the mat business, Ropati said because there was not enough money in it when the price dropped from 17 cents to 11 cents per square foot; that Transocean had gone bankrupt when it couldn't pay its pilot and navigator any longer; that he received a seven percent commission as agent of Transocean while in operation. Ropati answered that he did not know of the poor condition of the MANU'A TELE; that he would serve Lei if Lei were selected to hold the Mauga title.

On cross-examination from Mageo, counsel for Iulio, Ropati did not answer when asked if he had gained or lost in all his businesses; he said he had done jobs for the benefit of the public and not for his own personal benefit. When asked whether the Viavia and the Manuma clans were one and the same, Ropati answered that Manuma was the son of Viavia, but that Mulivai was the father of Viavia. When asked if there had ever been two persons holding the title Mauga at the same time, Ropati stated there was only one Mauga from Gagamoe. When asked if Mauga Manuma and Mauga Lei held the title at the same time, Ropati stated they had not held the title at the same time; that Lei had taken the title over from Manuma when Manuma was exiled to the Marshall Islands, and that when Manuma returned from exile, he took the title back from Lei; that Mauga Manuma had been exiled because of political activity against the Government of Western Samoa, at that time under the Germans.

When Mageo asked Ropati who had helped Mauga Manuma get to Gagamoe, Ropati broke down crying and then answered it had been Mageo and Usuiali'i. (At this point counsel for Ropati requested a recess from the Court so that Ropati could compose himself. The Court, fearing that an altercation might result between Ropati and Mageo if Ropati left the witness stand at that moment, refused the recess then, but granted it a few minutes later. After a couple of more questions, Ropati composed himself on the witness stand.)

Ropati testified that he had seen Mauga Moimoi but had not seen Mauga Taufaasau, even though it was alleged that Mauga Moimoi and Mauga Taufaasau had held the Mauga title at the same time from 1900 to 1913.

When asked if he had ever slapped Mauga Palepoi, Ropati answered in the negative; that it was taboo for him to touch a Mauga. When asked if his family had objected to the selection of Palepoi as Mauga and had moved to Fusi, Ropati answered that there had been a disagreement.

When questioned by Ta'a, counsel for Te'o, when he last held the title of Utaifeau, Ropati stated he still held the title Utaifeau; that he knew of no other Utaifeau at Pago Pago at this time.

Lolo, counsel for Sialega, asked Ropati if he knew what instrument was used to determine magnetic direction, and Ropati answered it was the transit. Lolo then corrected him, saying it was a compass and not a transit that was used. When Lolo asked Ropati how much he had contributed for the building of the guest house, Ropati answered he had spent $2,500 or more. When reminded that his, Ropati's, Exhibit No. 2 gave his contribution as $1,000, Ropati answered the figure in the paper was right.

Ropati testified that Tulimalefoi was not a clan in the Mauga Family. When asked again if Mauga Viavia and Mauga Manuma belonged to different clans, Ropati an-

swered that Manuma was the son of Viavia. When asked again, he stated they both belonged to the same clan. When Lolo reminded Ropati that he, Ropati, had testified earlier that the three clans in the Mauga Family were Viavia, Manuma and Sai, and asked him if Ropati now claimed there were only two clans in the Mauga Family since he stated that Viavia and Manuma were from the same clan, Ropati gave a lengthy but completely irresponsive answer and left the question unanswered.

When Lolo asked Ropati if he was qualified to get the men in Pago Pago to clean up the village and work in the plantation and stop the men from drinking beer, Ropati answered that that was his program for the future, if he got the title. Ropati answered that Mauga could name anyone Utaifeau, whether the person had Mauga blood or not; that he had given some land for the chlorination station for the reservoir. When asked where Mauga Manuma lived, Ropati answered he had not seen him but heard he had lived at Gagamoe; that at Mauga Palepoi's funeral, Folausaua had taken care of the body.

When Apelu, counsel for Logo, asked Ropati how he knew Logo had no Mauga blood, Ropati answered that he was raised in the Mauga Family and that he knew. When asked if he had been present at the trial of the last Mauga title in 1935, Ropati answered no. When asked if Mauga Tamaalemalo had a son Mauga Ili, Ropati answered he did not know. When asked if Mauga Tamaalemalo was also the father of Tulimalefoi, Ropati answered he did not know. Ropati testified that he was in Tutuila when Mauga Moimoi died, but that he had not attended the funeral because he was on duty in the service, but that his father had attended; that he did not know who had looked after Mauga Moimoi's body.

When Apelu asked Ropati why he had not put his plan to work in Pago Pago before, Ropati answered that a person

had to hold the title Mauga to have a voice in the village. When Apelu reminded him that he, Ropati, had testified that Manuma was second to Mauga, Ropati testified he couldn't get things done without the Mauga title. When Apelu further questioned Ropati why he had not advised the last Mauga about his, Ropati's, plans to improve the village, Ropati testified that Mauga Palepoi was too old and too ill to lead the village; that the chiefs would not show up when Mauga called meetings of the council.

When Folausaua questioned Ropati as to why he, Folausaua, had taken care of Mauga Pelepoi's [sic] body if he was not an heir of Tulimalefoi, Ropati stated he did not know; that it was up to Folausaua's branch to select a person for the honor, that the position had nothing to it except wave over the dead body. When Folausaua asked Ropati why Logo had no Mauga or Tulimalefoi blood, Ropati answered that he did not know about Tulimalefoi blood, but that Logo certainly had no Mauga blood. Ropati testified that he had never seen Logo participate in Mauga Family matters at Gagamoe before the last Mauga died. When asked by Folausaua if Mauga Viavia was the eighth holder of the Mauga title, Ropati answered that he did not know. When asked to name all the holders of the Mauga title, Ropati set them out as Mulivai, Viavia, Titilupe, Manuma, Lei, Manuma, Moimoi, and Palepoi; eight in all. Ropati testified that he did not agree that there were 15 Maugas from the beginning.

When asked by Folausaua to name the three clans in the Mauga Family, Ropati named them as Viavia, Manuma, and Sai. When asked if the heirs of Mauga Pulumataala descended from a clan in the Mauga Family, Ropati answered no. Asked if he understood Samoan culture and customs, Ropati answered, "Not very well, but I understand it; I know it."

When Usu, counsel for Leulua'i, asked Ropati if he had ever been present at a council meeting in the Village of

643

Pago Pago since he acquired the title Manuma, Ropati answered that he had not. When asked why, Ropati answered that it was because he wanted peace; that since Mauga died he did not want to take advantage; that he would go back when another Mauga was selected. When Usu asked Ropati if the village chiefs refused to let him enter the council meeting because Manuma was a young man's title, Ropati said that was not so.

In answer to Usu's question, Ropati again stated that he still held the Utaifeau title at present. When asked if he knew what title Tutuila Histake was holding presently, Ropati answered that he did not know if Tutuila now held the Utaifeau title. Ropati further testified that Mauga had shaken hands with him and told him he was the Utaifeau. When asked by Usu if Pulumataala ever held the title Mauga, Ropati answered that he did not know. When Usu challenged Ropati's knowledge of Samoan customs and told him he did not know anything, Ropati said it was nothing hard; that he could pick up the salutations from the other villages fast; that he only had to show them respect; that it was the Talking Chief's duty to do the talking. When Usu asked whether it was Mauga Mulivai or Mauga Pulumataala that first lent great dignity to the title, Ropati answered it was Mauga Mulivai.

On re-direct Ropati testified that the $1,000 he had listed in his exhibits as contributions to the building of the guest house did not include food and other contributions, only materials. Ropati also testified that he had a compass attached to the transit to find the magnetic North.

Candidate Iulio testified that he was 60 years old; that he lived in Pago Pago; that he had 100% Samoan blood; that he had been out of American Samoa on five different occasions, once on a church trip and four trips as an employee of the Government of American Samoa when he was Sanitary Inspector; that he lived as a Samoan with Sa-

moans, and that he was a descendant of a Samoan family. None of the counsel for the other candidates cross-examined Iulio as to his qualifications under Section 6.0101 of the Code.

Iulio testified that he did not agree with Te'o's claim to having one-fourth Mauga blood, but that he thought Te'o had one-eighth Mauga blood. He stated that he did not agree with either Logo or Folausaua that each had $1/256$ Mauga blood, but that, in fact, neither of them had any Mauga blood whatsoever.

Iulio testified that there were three clans in the Mauga Family, namely, the Sai clan, the Manuma clan, and the Pulumataala clan, and that all three clans favored him.

In connection with issue number three regarding forcefulness, character, personality, and knowledge of Samoan customs, and the fourth issue regarding the value to the family, the village, and the country under Section 6.0107 of the Code, Iulio testified that the different heads of the Mauga Family have not been in very good relationship since the time Mauga Palepoi held the title; that he had at one time advised Mauga Palepoi to vacate the title to keep the title from falling into disgrace; that the matters within the family had gone bad because of the last matai; that he had tried to improve things for the family for a long time after he finished school, but it was not possible.

He testified that he had graduated from the Marist Brothers' School and later attended a Catholic college for four years; that he had taught at the Brothers' School for three years; that among his students were Peter Coleman and Eric Scanlan, who later became Governor and Secretary of American Samoa, respectively, and others; that he was made assistant school principal and later was selected by the Bishop to represent all the church's schools in Western Samoa in relation with the Government schools, and that he represented all the church's schools and all Samoan

645

members of the Catholic Church at the dedication of the Government school at Malipa, Western Samoa.

Iulio further testified that he worked for the Public Health Division of American Samoa in 1931; that in 1933 he was made Chief Sanitary Inspector and also handled all the office work at the Sanitation Department and helped the Accounting and Personnel Service; that on request of a Navy officer he was sent to lecture on health and sanitation at Poyer School and also was in charge of inspecting restaurants and other places where food was sold.

Iulio testified that during the last war he worked with the Government in the Fingerprinting Division; that he drove the only vehicle on the Island for the head of the 7th Defense Command, Mr. Isaacs; that he served as interpreter at a secret meeting at which General Eisenhower, General Brown, Governor Tate of Western Samoa and other English generals met with the Chiefs of the Eastern and Western Districts to explain to the Samoans the importance of the presence of United States Forces on the Island; that he was named Quarantine Officer and worked in that position until he left the hospital during the war; that he helped in inspecting to see if food was fit for consumption after a hurricane; that he helped the Attorney General's Department under Colonel Baraco in controlling venereal disease; that he helped compile the annual report for the hospital at the request of Governor Hanson; that while working at the hospital he replaced a Palagi employee and took over the job of Statistician; that he was in charge of inspecting ships arriving in American Samoa; that he was sent to Swains Island several times while Sanitarian and sampled water in the lagoon; that he later went back to teaching.

Iulio testified that he had served three Maugas—Mauga Taufassau [sic], Mauga Moimoi, and Mauga Palepoi; that he was very young at the time of Mauga Taufassau [sic], but served him by getting fire for him and Ifiifi from a tree

to have his hair stick up, and that he took care of his horse; that he only served Taufassau [sic] for about a year and then he died. Iulio testified that he served Mauga Moimoi as a young man; that his, Iulio's, father, Taelase, applied to be named Mauga when Taufassau [sic] died, but that Mauga Moimoi had appealed to the Government not to name a second Mauga and that the Government had decided not to fill Mauga Taufassau's [sic] vacancy but to allow only one person to hold the title Mauga; that after this decision his, Iulio's, father started serving Mauga Moimoi; that when he, Iulio, was about 20 years old his father sent him to Gagamoe to serve Mauga Moimoi and his wife two or three times a week; that Letuli and Palepoi (later Mauga) were at Gagamoe with him, because of clan relationship to Moimoi, but that they both slacked off in their jobs and he, Iulio, had to do most of the work; that in 1924 he went with Palepoi, before he became Mauga, to Western Samoa, when Mauga Moimoi wanted to enter a boat in the race, and came back after the race; that they went and returned on the U.S.S. ONTARIO; that while in Western Samoa they lived with Iulio's family; that he later went with Mauga Moimoi for Mauga to preside at a meeting of the L.M.S. Church in Western Samoa; that he helped in getting Moimoi the things necessary for the trip; that when Mauga Moimoi died he, Iulio, and his family had to take care of the funeral, and that they contributed 15 fine mats, 2 pigs, cases of mackerel, 100 loaves of bread, etc.

Iulio testified that when the Mauga title became vacant following the death of Moimoi, Palepoi came back from Western Samoa and applied for the title, and that Palepoi was given the title by the Court; that at the ceremony for the official investment of the Mauga title on Palepoi only his, Iulio's, branch of the family was at the saofa'i; that neither Te'o, nor Lei, nor Ropati nor any of the others were present; that even though he had been approached by the

others to boycott the ceremony for Mauga Palepoi, he had attended even though the rest of the people didn't show up; that he had good relations with Mauga Palepoi and served him with money and other things.

Iulio further testified that he had been against the move of the Mauga Family to oust Mauga Palepoi from the title; that he had received a telegram at Western Samoa from the Governor of American Samoa to come back; that when he, Iulio, got back, the Governor told him of the family's attempt to have Palepoi ousted as Mauga for some infraction he had committed and that he had expressed an objection to the removal of Mauga; that he had testified at the trial of Mauga Palepoi in Court and had again stated that he was against the ouster of Mauga Palepoi; that the Court had fined Mauga Palepoi for the offense but had not taken the title away from him.

Iulio testified that if he was selected for the title he would work to bring the family together; that he would give the family understanding by organizing the family and improve the status and standards of the youngsters and instruct them to become good citizens; that at present the young people of Pago Pago were involved in smoking, drinking and other bad activities; that he would make sure that all the youngsters attended school; that he would encourage the people to be good Christians and make them proud of belonging to the Mauga Family; that he would advise the people when they had problems and visit them when they were sick; that he would encourage the family to work in their plantations and raise their own food.

Iulio continued by saying that, if selected, he would call the Village Council together and discuss matters of benefit and concern to the whole village, to beautify and improve the conditions of the village and get the village to back the Government programs; that he would work to improve the problem of pigs running loose, keep people from throw-

ing rocks at passing vehicles, and enforce the village regulations; that he would try to help the traffic problem in the village in connection with automobiles, motor bicycles, etc.; that he would work to protect the new school buildings being constructed and have the village take some responsibility for looking after the schools; that he would work to improve the education of the village and teach people to preserve the water and not waste it; that he would have the Village Council adopt a program to control the young people from drinking, fighting and using profanity; that to improve the bad food situation in the bay area, he would get the Village Council to get young men of the village to work on plantations.

Iulio testified that he would work for the betterment of the county; that, if selected, he would call all the matais from the different villages in Mauputasi County to Gagamoe to set up programs for the improvement of the villages and their lands; to get the Pulenuus to do their jobs well; to see that villages were kept clean for their own benefit and for the tourists; that he would try to get some of the roads in the county paved and have schools for the youngsters to attend; that he would get together with the other High Chiefs to fully support the Government programs; to encourage villages to give their land for the building of schools; that if he were to hold a Government position, he would try to do his best; that he would encourage the villages to cooperate in the protection of coconuts and bananas from diseases; that the chiefs together could work to improve the general situation by discussing and influencing the Governor to take certain actions.

In answer to questions from his counsel, Mageo, Iulio testified that the three clans in the Mauga Family were the Sai clan, the Manuma clan, and the Pulumataala clan; that he, Iulio, descended from the Pulumataala clan; that members of the Manuma clan were also supporting him, in-

cluding Mageo, and that Tago of the Sai clan was support-
ing him, too, and that he was also supported by the Pulu-
mataala clan, from which he descended; that Lei and Pale-
poi were supported by the Sai clan, but that Lei had already
testified he would support any one selected.

In answer to Mageo's question, Iulio testified that after
four years in college he had become a catechist and a
teacher; that his studies gave him the forcefulness and
character to lead people.

Iulio testified, in answer to Mageo's questions, that he
had a good knowledge of Samoan customs and that he knew
the Mauga Family traditions and the history of Pago Pago
Village; that he knew the Samoa traditions of Mauputasi
County, the whole of Tutuila and Manu'a, and also the
Western Samoan traditions. Mageo asked Iulio to correct
certain salutations uttered by Ropati and Lei, and Iulio did
it without hesitation, and his corrections were never re-
futed. He also answered other questions regarding Samoan
customs with great assurance and apparent complete
knowledge.

When Mageo asked Iulio what other things he might do
for the family, Iulio testified that he would get the other
candidates and their families together, have them greet each
other and forget about previous differences; that he felt
he was able to get the family together, even though it would
not be an easy matter after all the dissension and hate
created when Ropati had filed for the title.

Again in answer to questions from Mageo, Iulio testified
that he knew the lands of the Mauga Family well and men-
tioned some names; that he was not in favor of having all
the land of Mauga surveyed because he thought the sur-
veying of the land might cause fights amongst the differ-
ent families and perhaps bloodshed; that he feared that
once the communal lands were surveyed, it would make it
easier for a matai to dispose of the land belonging to his

particular family, and that this might deprive the others of their land.

In answer to Mageo's questions, Iulio testified that "Manuma" was not an old matai title in Pago; that it was a young man's name; that Ropati had gone to Mauga Palepoi to have him approve the name "Manuma" as a matai title; that Mauga and Ropati went to Court and had "Manuma" registered as a matai name; that the title Manuma was not recognized in Pago Pago at present; that Manuma was not second in rank to Mauga; that the second in rank to Mauga is Sa'ofetalai also known as Fanene.

When questioned about his income, Iulio testified that at present he had no money because the church forbade catechists to enter into business or hold other jobs; that he depended on what people in the village gave him. Iulio testified that if awarded the title he would resign his present position and that he could then make more money than any of the other candidates; that other districts such as Sua and Vaifanua, Ituau and Alataua, and Fofo and Aitulagi also supported Mauga. Later he testified that the support of these last-mentioned districts was not material but merely honorific.

Iulio testified he had been a candidate for the Mauga title in 1935 and that not one of the present candidates had been in the case in 1935, except Te'o; that Ropati's father and uncle had been candidates, as had the father and uncle of Lei; that he was the only loser to render services to Mauga Palepoi after he got the title Mauga; that the rest of the losers were dissatisfied and had gone to set up their own village—B—in Pago Pago in opposition to Mauga for a long time, and that there were some difficulties even at present as a result of that split; that Mauga Moimoi and Mauga Taufaasau had held the title at the same time; that Mauga Pulumataala was the first Mauga to raise the dig-

651

nity of the Mauga title; that he descended from Pulumataala.

Iulio, in answer to Mageo's question, testified that the ownership of the land Vaitafe, which Ropati claimed he had given to the Government for a water tank, was still pending in Court, four people all claiming to own it: Mageo, Manuma, Vaivao, and Tuisooga.

In answer to questions by Tuia, counsel for Ropati, Iulio testified that differences between the Mauga Family members still existed; that those differences could not have been settled before this trial; that he had tried to settle the difficulties but that no agreement could be reached.

When Tuia asked Iulio who had been the original Mauga, he answered it had been Mauga Mulivai; when Tuia tried to press Iulio for the relationship between Mauga Pulumataala and Mauga Mulivai, Iulio answered that there was a relationship but that he did not want to disgrace the Maugas before Pulumataala by talking about them; that Pulumataala was the holder of the title Mauga when Christianity came to American Samoa and that previous to that the holders were referred to as the Maugas of the dark days because very little was known for certainty about them; that Mauga Pulumataala resided in Gagamoe and was buried at Gagamoe; that Gagamoe was the name of the general area and also the seat for Mauga's guest house; that Mauga Paniani had been to Gagamoe, but he did not know where he was buried; that Mauga Taufaasau resided at Gagamoe and was buried next to Mauga Palepoi; that Mauga Taufaasau succeeded Mauga Paniani; that he did not know if Ropati descended from the Manuma clan; that he had not heard of a woman by the name of Titilupe holding the title Mauga; that he knew of a Mauga Manuma but had not personally seen him; that Mageo claimed he descended from Manuma; that Te'o and Leulua'i also descended from Mauga Pulumataala; that the Maugas from

Pulumataala to Palepoi were: Pulumataala, Paniani, Taufaasau, Viavia, Manuma, Sai, Moimoi and Palepoi; that when Moimoi and Taufaasau held the title at the same time, Moimoi lived at Gagamoe and Taufaasau lived at Lesolo, which is included in the general area of Gagamoe; that Mauga Palepoi came from the Sai clan, the same as Moimoi; that the candidates from the Pulumataala clan had met to try to agree on one candidate but that no agreement was reached; that Ropati never discussed the title with him.

Still in answer to Tuia's questions on cross-examination, Iulio testified that he had met with the Pulumataala clan between the pretrial conference and the trial date, but that no agreement was reached; that between 400 and 500 people in the Pulumataala clan claimed Mauga blood and that of these about 300, all residents of American Samoa, were supporting him, Iulio; that these included the majority of the clan members living in Pago Pago, those living in Siufaga, Aua, Leloaloa, and Leone, and that he also had the support of the Mageo Family.

Iulio answered Tuia that he had taught at the Brothers' School for three years; that he was then paid $35 per month; that he stayed teaching at that salary as a service to his church; that when he started working for the Government he was making $15 per month and that when he resigned from the Government after 12 years he was making $150 per month as Chief Statistician in the Medical Department; that he had trained his successor, Pele, for the job he left; that while working for the Government, he was present at Mauga Family meetings whenever it was possible; that he, Iulio, did not always wear a necktie and coat; that Mauga did not wear a tie at family meetings, but always wore a tie when attending to Government business; that he served Mauga Taufaasau when he was seven or eight years old; that he served Mauga Moimoi from the age of 18 until Moimoi's death in 1935; that he served Mauga Pale-

poi from his installation until his death; that the Utaifeau under Mauga Taufaasau was Polo; that Ropati's uncle was Utaifeau under Mauga Moimoi; that he, Iulio, had never been Utaifeau nor had any of his five sisters ever been Tulimalefoi; that at Moimoi's funeral he, Iulio, had personally contributed 8 fine mats, 1 case, bread, and other things; that Mauga Palepoi lived in Western Samoa before given the title; that it was possible Ropati ahd [sic] held the Utaifeau title while he, Iulio, was away; that Ropati's sister held the title Tulimalefoi; that when Mauga wanted to sell the land in Fatumafuti he, Iulio, went to object to the sale five different times to Judge Wood and that the judge would chase him away; that the last time he went to object to the sale of Fatumafuti, Judge Wood threatened to put him in jail.

In answer to Tuia's question, Iulio testified he had some plantations; that at one time he supplied the hospital with papaya for three weeks and received $85, but that generally he derived very little income from his plantations; that because he could not himself engage in business, an old lady in the family sold the products at the market place.

When asked if he had helped build Mauga's guest house, Iulio testified that all the posts for the previous guest house had come from his land; that he had last visited the present guest house on the previous Saturday, January 30, 1965, and on February 1 and February 3, 1965; that the condition of the guest house was bad, that it leaked; that he had served Mauga during his, Iulio's, years at Western Samoa through his family and also personally, when Mauga went to Western Samoa, by furnishing a vehicle for him and by selling him tobacco and mangoes from Western Samoa.

When asked how he would accomplish getting the roads fixed, Iulio testified he would first go to the chiefs of the village and discuss how to get the road paved; that, if neces-

sary, they would go to the Governor and tell him of the bad situation the roads were in and that if the Government decided it was up to the villages to pay for the road repairs, attempts would be made to raise the money by the village. When asked several questions about the Government, he answered that he did not know as he was presently a catechist and not active in Government matters.

Iulio answered that he had been present at the Mauga Family meeting of August 12, 1964; that there was no definite decision; that Leiato said that there would be another meeting in two or three weeks, at which second meeting the applicant and the objectors were to withdraw, but that said meeting was never called; that Leiato, Tuitele and Letuli were supposed to have called the second meeting; that he, Iulio, was not present when Mauga Palepoi presented Ropati to the village as matai; that Mauga could have made Ropati a matai if it was in good taste, but that this was not usually done. When asked if Ropati was a matai of Pago Pago, Iulio answered that the village had always been against it and that up to the present the Village of Pago Pago has not accepted the Manuma title.

Iulio correctly answered Tuia's questions regarding the names of chiefs in the different districts. When asked if these chiefs rendered services to Mauga, Iulio stated that the words "render service" were too strong; that the High Chiefs could never render services to another chief, but that the support was in salutation and the Samoan tradition.

When asked if he objected to Ropati's exhibits, Iulio answered that he believed Ropati received the medals, but that he, Iulio, did not know who had actually done the writing on the other exhibits; that he would support Ropati if selected for the title.

In answer to questions on cross-examination by Fofo, counsel for Lei, Iulio stated that he would serve Lei, if

selected; that the Lei and Sai clans were one and the same; that he first became Sanitation Officer in 1931 and Chief Statistician about 1938; that the statistician's job consisted of keeping track of births, deaths, people treated at the hospital, visitors, slaries [sic] of nurses and other employees, total money spent for maintenance and other work in the hospital, the cost of medicine, and other matters.

In answer to Fofo's question whether he would attempt to change the law regarding matais if elected to the Legislature, Iulio answered that before he attempted to change any law, he would have to make a study of the Code. Fofo next asked questions regarding Samoan customs, which Iulio answered; he stated that if the county chiefs refused to get together with him for a meeting, he would try and try again. Fofo then asked Iulio about his knowledge of theology and his work as catechist.

When asked who of the Sai clan supported him, Iulio answered that he had the support of Chief Tago, and that Lei had testified he would support Iulio, if selected.

When Fofo asked him if he had a staff working under him at the hospital, Iulio answered that he was next to the palagi boss and that he, Iulio, had supervision over the palagi nurses and others.

Asked why he had lost the Mauga title case in 1935, Iulio answered that such had been the Court's decision, and that he had not questioned it; that he was 30 or 31 years of age when he applied for the title in 1935; that he, Iulio, would give up his present job if selected for the title.

Again under questioning by Ta'a, counsel for Te'o, Iulio stated that before Mauga Pulumataala there was no record of the doings of the previous Maugas; that Poumale was older that Paniani; that Pulumataala had three children.

Under questioning by Lolo, counsel for Sialega, Iulio testified that he derived very little money from his plantations; that he used that money to support his family; that as cate-

chist he got very little; that he had to make his own living because sometimes he got nothing from his congregation throughout the year. In answer to Lolo as to how he supported his family, Iulio testified, with great dignity and character, that sometimes in the morning his family could not afford tea and that they had to cook with coconut juice and ate mostly Samoan food, and that at night sometimes they did not eat a full meal; that he had supported the last Mauga with money, fine mats, food, clothing, transportation, etc. When asked if he expected the family to support him if he became Mauga, Iulio answered that he would force no one to help him, except when expected under Samoan customs, as in fa'alavelaves; that he only expected support from the other districts in matters of salutation and in the traditional way; that once he resigned from his present job he could make more money than any of the other candidates; that he now lived in Pago Pago on the communal land of the Taufaasau Family, but that Taufaasau also had rights to other Mauga lands; that he had heard that Mauga once had land in Amouli but that the land had been left to Gogo and Gaea.

Still answering Lolo's questions, Iulio stated that members of the Sai clan were presently at Gagamoe; that there were no members of the Pulumataala or Manuma clans now living at Gagamoe. Again, rather than bring disgrace on the early Maugas, Iulio stated that Pulumataala was holding the title Mauga when the church arrived in Samoa; that Pulumataala had been bestowed with the title Mauga, not for services as such but for his heroic deeds and actions; that in those days Tutuila was under the rule of Western Samoa; that the main leader in American Samoa was Leiato Tafilele; that Leiato turned to Pulumataala to help the people of Tutuila; that both Leiato and Pulumataala worked together to defeat a common enemy, and that the

throne was given to Leiato who had rewarded Pulumataala with the Mauga title, including certain salutations.

In answer to Lolo's question, Iulio testified that Tago, a member of the Sai clan, was supporting him; that he would support Sialega loyally if Sialega were to be awarded the title. When Lolo asked Iulio if he wanted to give up his job as catechist for the Mauga title, Iulio answered him that the Bible said that all jobs come from God.

In answer to cross-examination by Folausaua as to the descendants of Pulumataala, Iulio again answered that the Maugas before Pulumataala were known as the Maugas of the dark days, and that they should not be talked about. Iulio agreed with Folausaua that Lei was from the Sai clan. When Folausaua questioned Iulio as to the names of the Kava cups for Le'alaifuaneva and Tamaalemalo, Iulio answered without hesitation, and his answer was not challenged.

In answer to questions by Muasau, counsel for Sami, Iulio repeated that he had graduated from the Brothers' School; that he had not attended Government school; that he had gone to college for four years; that he had worked for the Government of American Samoa; and that he was presently a catechist. When Muasau asked Iulio whether he liked better to work for the Government or as a catechist, Iulio answered that every job was a job done for God, whether as catechist, as Government employee or as a matai; that, if selected, he would like to hold the Mauga title.

In answer to a question by Usu, counsel for Leulua'i, as to how long the Village of Pago Pago was split after the trial of 1935, Iulio answered that it stayed split for a long time, close to 20 years; that Leulua'i had taken Mauga's side; that Leulua'i was with Iulio and others when Mauga Palepoi had his saofa'i; that the title of Utaifeau in Pago Pago was presently held by Tutuila. Again, when Usu asked

Iulio which was the more important job, that of a catechist or as a matai, Iulio answered that every job is a job for God in its own way and that all were important to God. In answer to Usu's question, Iulio again stated that he would resign from his present position if awarded the title Mauga.

On re-direct from Mageo, Iulio testified that Mauga Lei and Mauga Manuma held the Mauga title at the same time; that Fanene was the second in rank after Mauga in Pago Pago; that Mauga had a right to give the titles of Utaifeau and Tulimalefoi to anyone he wanted; that when he, Iulio, came back from Western Samoa, he asked Mauga if his, Iulio's, family had served him while he was away, and that Mauga Palepoi told him that Iulio's family was serving him very well in many ways, and that Mauga had shown him what Iulio's family had taken to him at the hospital on that Sunday; that he did not know how many favored his candidacy in the Sai and Manuma clans; that he would swear to support the one chosen for the title, and that his family had a clean record of always supporting the Mauga.

We have tried to set out at length the pertinent testimony of the candidates we have ranked first and second. To be sure, we have not covered all the testimony that is on the record for that is very voluminous, but yet after all this review of the evidence and testimony, there is one point which cannot fully be set down in words, namely, the individual personal demeanor, class and character of the persons as they testified and the impressions they left with the Court.

Candidate Iulio was without any doubt the individual with the most character, poise, self-assurance, education, clarity of speech and content, the most dignified looking, and inspired respect and confidence. Yet all this he reflected not through volume of speech or cockiness, but with a well-modulated blend of forcefulness and restraint, dignity and humility.

Never at any time did Iulio try through his testimony to emphasize the deficiencies of other candidates or to twist his testimony for self-aggrandizement. He never appeared to compromise the veracity of his testimony by uttering untruths to serve his best interests, and only seldom did he change an answer, except when it appeared that he might have misunderstood the question previously. To be sure his testimony was subjected to thorough and extensive cross-examination and challenged by counsel for the other candidates. On several occasions, Iulio tempered his testimony at the risk of appearing not to know the answer to questions. This was most obvious when on cross-examination he was repeatedly asked to talk about the Maugas prior to Pulumataala and he demurred on the ground that he did not wish to disgrace the holders of the Mauga title during the period known as the dark days before Pulumataala. Certainly he, Iulio, had the intelligence, imagination and the knowledge to have discussed those matters. The fact that he restrained himself showed great character and courage.

Iulio's wisdom in taking the risk of showing ignorance was emphasized when High Chief Leiato stood up from the audience to object strenuously to the disgracing of sacred matters when candidate Te'o was testifying on cross-examination to certain events which allegedly took place before the arrival of Christianity in Samoa. Such testimony is at best very inaccurate tradition passed from mouth to mouth and from generation to generation over the centuries, but the average candidate, fearful of being thought ignorant, will go to any lengths to relate such tradition or make up his own. Iulio showed good taste and candidness in restricting his testimony about the Mauga title holders' tradition from Pulumataala to the present.

Iulio also showed moral courage and character in his answers when he was repeatedly, almost mockingly, questioned on cross-examination regarding his present position

and his finances. He always kept a cool head and to a great extent gave relevant, responsive answers.

Ropati's demeanor on the witness stand ranked him high enough to be rated second, after Iulio. He appeared impressive as the only candidate dressed in the Samoan native dress with the traditional Paogo Ulafala worn by matais. Without considering the weight of the testimony, Ropati's impression on the witness stand as to demeanor, forcefulness, character and personality was not as favorable as Iulio's. Ropati's testimony appeared at first to be candid and straightforward, but the force and weight of his testimony was greatly weakened on cross-examination and by the testimony of other candidates. Some of his answers appeared to reflect not a desire to give a truthful answer but seemed prompted by what would be in his best interest to bolster his candidacy. Certainly there is nothing wrong in a person's helping his own cause, but in the case of Ropati too many inconsistencies appear. This and other matters tend to detract from Ropati in connection with the third and fourth issues under Section 6.0107 of the Code.

Ropati insisted throughout the trial that he still held the title Utaifeau and that he did not know of any other Utaifeau at present when all the other eight candidates testified that the title was held presently by Tutuila Hisatake and not Ropati, and others testified that Ropati had been ousted from the title. Ropati testified that the title Manuma was second in rank only to Mauga, but that he had never attended a council meeting since he, Ropati, obtained the title Manuma, while other candidates testified that "Manuma" was not a recognized title in the Village of Pago Pago and that Ropati had never been accepted as a matai by the village.

Ropati tried to deny that anyone but himself served Mauga and tried to detract from the services rendered by others. While there is no question that Ropati served

Mauga Palepoi well, there is also no question that in some cases he exaggerated or misrepresented the extent of the services, as when he testified that he had spent $2,500 on the guest house and his own exhibit showed only $1,000, or when he testified as to his good relations with Mauga Palepoi and a letter in his own exhibits reflected otherwise. Further, there was testimony that Ropati, together with many others, had split from the rest of the Mauga Family after Palepoi was awarded the title Mauga by the Court.

Ropati testified that he did not use liquor, yet Te'o testified that Ropati had slapped him while Ropati was drunk. Again, in one breath Ropati testified that he had refused to lead the dances at the request of Mauga because he did not want to appear like Mickey Mouse, and then in the next breath stated he had refused to dance because he was sick in the hospital.

Ropati testified that the title Mauga was never held by two persons at the same time, while most of the candidates agreed the title was held jointly twice, once by Lei and Manuma and also by Taufaasau and Moimoi. This Ropati claimed either because he did not know the recent tradition of the Mauga Family, because he did not want to agree with the rest of the candidates, or for some reason did not want to reveal or accept the truth.

▮ Ropati at different times insisted that the only three clans in the Mauga Family were the Viavia, the Manuma, and the Sai clans, and only after several irresponsive answers did he say that the Viavia and Manuma clans were one and the same. Though he always claimed there were three clans in the Mauga Family, he never accepted that there was a Pulumataala clan or that Pulumataala had ever held the title Mauga, while the great majority of the candidates agreed that the three clans were the Sai, Manuma, and Pulumataala clans, and that Pulumataala had been the outstanding holder of the Mauga title. Ropati even denied that members of the Pulumataala clan

were members of the Mauga Family. Here again, Ropati's testimony reflects either that he does not know or agree with the generally accepted tradition of the Mauga title or that he was purposely being evasive and misleading in his answers. There is no doubt that there is a Pulumataala clan and that said clan has many members in the Village of Pago Pago. For a holder of the title Mauga to deny the existence of such a clan or its descendants would only lead to a great difficulty and division within the whole Mauga Family. To deny the existence of Mauga Pulumataala would be to insult the thinking and tradition of the people in all the three clans of the Mauga Family. If a matai cannot make peace within the family, he certainly will be of little value to the family, the village, or the country.

There are other discrepancies or weaknesses we could set out on the part of Ropati, such as his testimony that he had given some land to the Government, when the title to said land is still in dispute in Court, but we believe we have already said enough.

In conclusion, it is the opinion of this Court that candidate Sialega ranks first on the issue of hereditary right with one-half Mauga blood. As we have stated before, we also find that candidates Iulio, Ropati, and Lei rank second on this issue.

The Court finds that none of the candidates had the support of the majority or plurality of the clans in the Mauga Family, and we are hereby disregarding this issue in determining this issue. None of the candidates proved that he had the full support of even one of the three clans, much less a majority or plurality of them. Rather than saying we are disregarding the issue of clans, it could also be said that each of the candidates, except Aumoeualogo and Folausaua, rank equally on this issue. We hold that Aumoeualogo and Folausaua do not have the support of any portion of either of the three clans.

█ It is the finding of the Court that candidate Iulio ranks first on the third and fourth issues under Section 6.0107 of the Code, and that candidate Ropati ranks second in these same two issues. The rank of each of the candidates and the issues are already set out on pages 629, 630. This Court is of the opinion that a candidate who ranks first on the third and fourth issues under Section 6.0107 greatly prevails over a candidate who ranks highest on the first issue of hereditary right under the same section. Taking all this into consideration, this Court is of the opinion that Iulio M. Taufaasau should be registered as the holder of the matai title Mauga attached to the Village of Pago Pago.

Accordingly, it is the decision of this Court, and it is hereby ORDERED, ADJUDGED AND DECREED that Iulio M. Taufaasau be registered as the holder of the matai title Mauga, attached to the Village of Pago Pago.

The Registrar of Titles will be advised of this decree.

Court costs in the total amount of $250.00 are hereby assessed against candidates Ropati, Lei, Te'o, Sialega, Aumoeualogo, Folausaua, Sami, and Leulua'i, each to pay $31.25 within thirty days.